THE AUGUSTA AND SUMMERVILLE RAILROAD COMPANY *v.*
RANDALL AND WIFE.

1. An affidavit made by a witness whose depositions were subse-
quently taken and introduced in evidence at the trial, in which
she testified that the affidavit was true, should, in order to have
appeared in evidence, have been attached to the depositions and
returned by its commissioner who took them.
2. Testimony of the president of the defendant corporation as to
the degree of care exercised before the injury in the selection of
drivers for its horse-cars, was not material to the question
whether the driver was negligent at time of the injury.
3. That the officer charged to serve a *subpœna* had made diligent
search for the witness at the place where he learned he had re-
sided, but had been informed by persons unknown to him that
they had heard that the witness was dead, was not sufficient proof
of the death or inaccessibility of the witness to allow the introduc-
tion of his testimony taken at a former trial.
4. Whether or not they were in rebuttal, it was within the discretion
of the court to allow the introduction, on the redirect examina-
tion of plaintiffs, of the depositions of a witness.

5. That the court refused to compel two female witnesses to come into court and testify, or to continue the case that their interrogatories might be taken, was not error where it was not properly shown what the witnesses would testify, or that their testimony was material. If, upon good reasons shown why it is necessary for such witnesses to attend in person, what they will testify, and the materiality of such testimony, the court is satisfied that it is necessary, in furtherance of justice, for them to attend, an order should be issued requiring them to do so. But while the statute permitting the interrogatories of such witnesses to be taken does not exempt them from attendance upon court, its provisions should be followed unless it be shown to the court that it is necessary to have their personal attendance.

6. During the argument to the jury, the defendant's counsel made improper remarks relative to what had transpired before the court on an application to compel the attendance of a female witness (which was denied), stating that he was unable to say what effect the testimony of this witness would have had, but desired to call the jury's attention to the fact that the defendant and its counsel had done everything in their power to have the witness brought into court, as they deemed her presence of great importance. In conclusion, plaintiffs' counsel stated to the jury that they also were anxious to have had the testimony of this witness, she being one of the most important witnesses they had; and made further statements to the effect that she was kept away by having been tampered with by defendant's superintendent. Upon objection on part of the defendant, which was sustained by the court, the statements as to tampering with the witness were withdrawn by counsel, who continuing said to the jury that at all events he believed before high heaven that, if the superintendent had not paid his visit to the witness, she would have come to court and testified, and that she was the most important witness plaintiffs had, and they were very anxious to have her presence. *Held*, that the remarks of plaintiffs' counsel tended to prejudice the minds of the jury against the defendant, and they require the grant of a new trial. Had counsel confined himself to a strict reply to the remarks of opposing counsel, and insisted only that he too desired the presence of the witness, a new trial would not have been demanded.

7. It was not error to charge in effect that if the plaintiff did not exercise ordinary care and caution, she could not recover if the company was free from negligence, but if she was negligent and the company was also, she might recover.

8. Though where special damages, such as expenses of nursing, physician's bill, medicine, etc., are sought, the rule of assessment according to the enlightened consciences of impartial jurors, is not applicable, it is so where the special damages alleged are not in-

sisted upon, and the only recovery sought is for injuries to the person and for pain and suffering.

9. It would be better to omit any instruction to the jury touching sorrow resulting from a miscarriage as an element of damage pain and suffering being sufficiently comprehensive.

10. Other grounds for new trial show no error.

April 23, 1890

Negligence. Evidence. Practice. Trials. Charge of court. Damages. Before Judge Roney. Richmond superior court. April term, 1889.

Salles Randall and his wife sued the railroad company for damages, and obtained a verdict for $1,000. The case came to this court, and is reported in 79 *Ga.* 304. On the second trial, the evidence for the plaintiffs tended to show that Mrs. Randall was a passenger on defendant's horse-car on the afternoon of June 11, 1885, seated near the door; that the car was crowded, and some of the passengers were urging the driver to hurry, that they might reach a point where a game of base-ball had commenced; that Mrs. Randall remained in her seat until the car crossed a turn-table just before reaching Calhoun street, which was crossed by the track of the railroad, and then rang the bell of the car and it stopped; that she then arose and went out the rear door, carrying bundles in her arms, and was about to alight from the last step when the car was suddenly jerked forward, throwing her violently to the ground and bruising her face and shoulder; that she rose, brushed herself, recovered her packages and walked to the front end of the car, which had moved on a short distance and again stopped, and asked the driver's name, which he told her; that she went to her home and found none of her family there, and then to the house of her sister-in-law across the street, who made her lie down and administered stimulants, etc.; that in about an hour she returned to her home and remained in bed all that day and night and for some time afterwards;

that she was nearly two months pregnant, but had a miscarriage and a continual flow of blood, greatly impairing her health which was remarkably strong and vigorous before the injury, and suffering greatly; that she sent for a physician on the same evening after her fall, and on the following day, but he did not come until the day afterwards and did not then prescribe for anything but her face and shoulder bruises and scratches, saying she was too sore then for an examination as to the miscarriage; and advising her to keep quiet, and she followed his directions, etc.

The evidence for the defendant tended to show that Mrs. Randall did not ring the bell of the car, and it did not ring until after the car had passed the turn-table and was half way across Calhoun street, when it stopped and a number of people alighted, including some ladies, some of whom went into a cemetery near by; that Mrs. Randall left the car while it was moving slowly and before it stopped, and attempted to alight while it was so moving, and fell; that she did not go to bed but on the contrary went to walk in the park early in the evening, and made to several persons statements to the effect that she was but slightly hurt, a little jarred, mortified by falling from the car under the circumstances, etc; that she declined to allow the physician who called to see her to make an examination to determine whether she had had a miscarriage; that there was no jerk of the car at the time in question, etc. There was conflict in the evidence on every material point. Mrs. Randall denied. making the contradictory statements attributed to her.

The jury found for the plaintiffs $2,000. The defendant moved for a new trial on the following grounds:

(1) Miss Medora Klotz made an affidavit stating that as the car neared the turn-table, it moved very slowly, but the bell was not rung until after the turn-table was

passed and the car was half way across Calhoun street, at which point deponent and other ladies alighted and went to the cemetery; and that she saw no one fall, but saw a lady leave the car while it was in motion, and soon afterwards heard some one say that that lady had fallen off and hurt her back. Subsequently Miss Klotz was examined under code sections 3893–8, and she testified to the same facts as stated in her affidavit, with others; and during the examination, defendant's counsel handed her the affidavit, and she testified that it was right, was the statement she had made and embraced all she remembered about the matter. The defendant introduced the depositions in evidence, and offered to introduce the affidavit also, insisting that it was a part of Miss Klotz's testimony, and was a memorandum accompanying her examination and required to be attached thereto, and which could be referred to for the purpose of verifying her recollection; and that the record of the examination returned by the commissioner showed that no objection had been made before him pursuant to section 3896 of the code. But the court, on plaintiffs' objection, excluded the affidavit; and this is assigned as error. The brief of evidence contains simply a copy of the answers of this witness, and shows that the affidavit was tendered to her; but it shows nothing as to whether or not the affidavit was attached or offered to be attached to the depositions, nor as to whether it was objected to.

(2) The court refused to allow defendant's president to testify as to the amount of care exercised by it, prior to this accident, in the selection of drivers, the objection being that it was not charged with employing incompetent men, but that the driver was negligent at the particular time in question.

(3) A *subpœna* had been issued for a witness who had testified for the defendant at the former trial, and

the officer who was charged to serve it testified that he had made diligent search for the witness at the place where he learned he had resided, but had been informed by persons unknown to him that they had heard that the witness was dead. Defendant offered to introduce the testimony of the witness which had been taken down at the former trial; but the court rejected it and held the proof of his death insufficient. The testimony was to the effect that in June, 1885, witness was riding at the back of a street-car, out of which a lady walked, stepped off and fell, the car then being below the turn-table; that he did not hear the bell ring; that she got up and walked fast to the front of the car and asked the driver's name, to which he replied that it was Stringer; that there was a white gentleman on the back of the car, and witness did not know who he or the lady was; and that the car was going slowly in a slow trot when she fell.

(4) The court admitted in evidence, on the redirect examination of plaintiffs, the depositions of Annie L. Young, over defendant's objection that this evidence was not in rebuttal but should have been offered in chief. Plaintiff's counsel insisted that it was in rebuttal; and on this statement the same was admitted. In the brief of evidence appear the interrogatories of the witness at considerable length; but the effect of her testimony is, that the car-bell was rung by some one not Mrs. Randall, and the car stopped after passing the turn-table; whereupon Mrs. Randall rose, carrying packages, and went out, and the next the witness saw of her was after she was said to have fallen (which witness did not see) and was standing on the ground asking the driver's name; soon the witness and others alighted, and she could not recollect whether or not the car moved any more after Mrs. Randall rose to go, being engaged in conversation.

(5) Upon the opening of court one morning during the trial, counsel for the plaintiffs stated to the court, in the presence of the jury, that on the preceding afternoon he had called, in company with one of the plaintiffs, at the home of Mrs. Bunch and in the presence of her husband obtained her statement as to what her evidence would be, not having had an opportunity to take her depositions, as they did not know of her testimony in time; that he told her that he deemed her evidence of the utmost importance to plaintiffs and begged her not to fail to attend court on the following morning, which she promised to do, and her husband promised to take her there; but early in the morning, Mosher, defendant's superintendent, had called at Mrs. Bunch's house and had a lengthy interview with her and her husband, after which she declined to come to court and her husband refused to allow her to do so; that they had not been subpœnaed, but counsel had received their assurance that they would be present, and he believed their failure to do so was attributable to defendant; and that as Mrs. Bunch's testimony was of great importance to plaintiff, he invoked such process as would compel her attendance.   Mosher was then in court seated near to defendant's counsel, who stated that he also desired Mrs. Bunch's presence, had only heard of her testimony that morning from Mosher, and from his statements touching his interview with her considered her evidence material and important to defendant; and joined in the request of plaintiffs' counsel to compel her presence; denying the doing of any act by any party or agent of defendant respecting the witnesses that was not lawful and right, and offering to place Mosher on the stand to show the circumstances under which the defendant acquired knowledge of the character and importance of the testimony.   The court did not sanction the introduction of Mosher's testimony, and stated that he had

no power, under the circumstances, to compel the presence of the witnesses (Mrs. Bunch and her daughter, Carrie Rivers), they being females and privileged. Plaintiffs' counsel stated that they were the most important witnesses they had, and would prove their case beyond question. Defendant's counsel applied for and obtained the issuance of subpœnas for these two witnesses and for Mrs. Bunch's husband, requiring their presence instanter and returnable instanter. In the meantime the case proceeded, and Mr. Bunch came into court. Counsel for plaintiffs stated that he desired to repeat in Bunch's presence what he had already stated to the court, and did so; and in response to a question by the court as to whether he would do so, Bunch declined to allow his wife and daughter to come into court as witnesses, and stated that he knew nothing of the circumstances of the injury. The court decided that he could not compel the attendance of the ladies. Defendant moved for a continuance of the case until it could obtain their testimony under the law after five days' notice, their testimony being newly discovered; but the motion was overruled. With this ground the defendant submitted the affidavits of Mary A. Bunch and Carrie Rivers, in effect as follows: In June, 1885, Mrs. Bunch occupied, with her daughter and two sons, two rooms in plaintiffs' house. On returning from a visit, she was surprised to find Mrs. Randall (of whose hurt she had heard on the way) sitting on the piazza, and upon inquiry as to her injuries, she replied that she had hurt her arm, shoulder and face. Her face was bruised. Mrs. Randall did not retire to bed until about the usual hour, and did not remain in bed for the next four days constantly, but was about the house as usual. Mrs. Bunch heard of nothing unusual as to her condition, nor that she had a miscarriage. Mrs. Bunch was in the house, on friendly terms with the family, and would

have heard of such an occurrence had it taken place; but neither saw nor heard of any serious injury to Mrs. Randall, who complained of none to Mrs. Bunch. In a day or so Dr. Ford called to see Mrs. Randall. On the evening after she was hurt, she went to walk with Mrs. Rivers in the park after tea, and there talked with Miss McNally about the injury. Mrs. Rivers did not hear of anything like a miscarriage or any injury of like nature, and regarded Mrs. Randall's injuries as slight. She did not complain much of her bruises or say she was badly hurt. On the 24th or 25th of October, Mr. Randall went to Mrs. Bunch and asked her if she would testify for him at the court-house that day; to which she replied that she did not want to do so, and that her evidence would be against him if she did; whereupon he appeared satisfied, and walked off. Salem Dutcher made an affidavit that Mrs. Bunch was entitled to full faith and credit as a witness.

In this connection counsel for plaintiffs and Salles Randall made affidavits in which appeared the following: When they called on Mr. and Mrs. Bunch on the evening of October 24, the latter told them that she was living in Mrs. Randall's house at the time she was hurt, and remembered that time; that she was badly hurt and went to bed soon after arriving at home from the cars from which she had fallen; and that she (Mrs. Bunch), in company with Mrs. Shellman and Miss Joanna Randall, sat for some time at Mrs. Randall's bedside. During the interview, one of plaintiffs' counsel (Judge Twiggs) stated to Mrs. Bunch that there was testimony offered in the case that, on the evening of Mrs. Randall's fall after it occurred, she was seen walking in the park and also paid a visit to the Dressell family; to which Mrs. Bunch replied this could not have occurred on that evening, as Mrs. Randall did not leave the house, and was suffering greatly and excited

v 85-20

by her fall; and that the witness who testified as stated must have been mistaken as to the time. Judge Twiggs told Mrs. Bunch that her testimony was very important to the plaintiffs, and asked if she would attend court the next morning to testify; and received the promise that she would do so from her and her husband, as narrated in his statement to the court above given; having notified her that he could not compel her attendance, and that it was too late to take her testimony, and receiving in reply their positive and repeated assurance that they would attend.

It further appears from the affidavits of Mrs. Bunch and of Randall and Twiggs, that she removed with her family from Augusta to Columbia county in the latter part of July, 1885, visited Augusta during the last three months of that year and returned; that she considered Columbia county her home, but frequently came to Augusta until March, 1886; and that Twiggs had learned that she occupied part of Mrs. Randall's house at the time of the injury, and was informed prior to October 24, 1888, that she had moved away from Augusta, but on that day was informed by Randall that she had returned and was then in the city.

(6) The court refused to allow the defendant to show by Mosher the facts and circumstances under which the testimony of Mrs. Bunch and Mrs. Rivers came to its knowledge, and that the charge made by plaintiffs' counsel to the effect that defendant had kept their witnesses from attending court, was untrue. This was important to defendant because the witnesses, though subpœnaed, refused to attend; thus leaving the case in a position where the charge made by plaintiffs' counsel was open to comment before the jury. This ground then recites what is stated in the sixth division of the opinion. With it the defendant submitted the affidavit of Mosher, in brief, as follows: During the session of

court on October 24, he heard. Mrs. Randall, while on
the witness stand, mention the fact that Mr. and Mrs.
Bunch occupied rooms in her home at the time of the
accident; and the question arose in his mind as to why
this testimony was not introduced when the plaintiff's
closed the case without introducing Mr. or Mrs. Bunch,
and he determined to make inquiry about the matter.
During the day he met W.F.Bunch and asked him where
his father and mother were, and when and where he could
see them. Bunch replied that he had been waiting to
see Mosher; that his mother and sister could testify so
as to help defendant's side of the case; and this inter-
view resulted in an arrangement for Mosher to call that
evening on the Bunches, which he did, meeting Mr.
and Mrs. Bunch, Mrs. Rivers and W. F. Bunch. He
asked for such information as they possessed, and Mrs.
Bunch said that Randall and Twiggs had called in the
afternoon and wanted her to go to court next day and
testify; but that she recollected very little about the
case and did not think whatever she could say would
benefit Randall; that she did not believe Mrs. Randall
was injured in the way she stated, because at the time
it made such a slight impression on her (Mrs. Bunch);
and that she could not have been very much injured,
for if she had been it would have made an impression
on her (Mrs. Bunch). Mosher then told her of what
the Dressells had stated as to Mrs. Randall's stopping
that evening to ask about Mr. McCall; to which Mrs.
Bunch replied that, after talking with Randall and
Twiggs, she did recollect something about it, but not
the date. Circumstances were mentioned to recall what
the date was; and then Mrs. Bunch told Mosher the
same in substance as is stated in her affidavits; and
further said that Mrs. Randall told her that it gave her
a shock and mortified her to fall before a car full of
people; and that she (Mrs. Bunch) got the idea that

she was not hurt much, and she (Mrs. Randall) so said. Mrs. Rivers also stated the substance of what is contained in her affidavit. Mosher then asked Mrs. Bunch if she had any objection to stating what occurred between her and Twiggs and Randall. She said Randall tried to get her to recollect that she was by the bed of Mrs. Randall on the evening after the accident, nursing her, etc., but she told them that she did not recollect anything of the kind, because she did not think it occurred. Mosher then told the ladies that though it was unpleasant for them to go into the court-house, he would request them, in justice to the company, to do so; and left it to them to say whether they would come; and they said they would leave it to Mr. Bunch. Mosher also said that, as they had not been in court before, he desired to avoid any charge against the company of trickery, as well as any statement from the plaintiffs' side that he had come to reward the ladies as witnesses or to become witnesses, for they knew no such thing had been done or would be done. They replied that they would think of it until morning. The next morning Mosher was met by John M. Bunch and told that they would not come; it might be charged that they had sold out to him (Mosher), and his wife was in bad health and his daughter too young to come; he was positive in his refusal to allow them to do so. This affidavit was corroborated in the main by W. F. Bunch; and John M. Bunch deposed that he refused to allow his wife and daughter to attend court, and so told Randall before court opened in the morning, with the further information that their testimony would not be in his favor any way, but in favor of the defendant. J. E. Bunch made an affidavit to the effect that, between the visit of Randall and Twiggs and that of Mosher, he urged his father and mother that she might not go to court to testify, because of the indelicacy of the subject on which she

would be interrogated, to wit, a miscarriage; that in pursuance of his request and in his presence they decided not to go, this being before Mosher's visit; that they did not stay away from any request of Mosher, as the fact of their intended absence was agreed upon before it was known that Mosher intended to call; and that later in the evening, after this call, deponent was informed that Mosher also wished his mother to go to court, but that she had declined in pursuance of deponent's request. The character of this witness for veracity was sustained by his employer in business, James G. Bailie, by his affidavit.

John M. Bunch made another affidavit, stating that one morning during the progress of the case, before the time for the convening of court, Randall and Twiggs called at his house to see his wife, deponent being present; and during the conversation, which related to her testifying, Randall called deponent's baby and gave it two nickels, and afterwards displayed a roll of money, and Twiggs remarked that Randall should not handle so much money in the presence of people; to which Randall replied that that was not all he had, drawing from another pocket a handful of silver and saying that he was looking to see if he had money enough to pay a bill which he owed. The affidavits of Twiggs and Randall positively denied all this, except the giving of the nickels to the child, whom Randall swore he had known well. They further deposed that they made no call in the morning, but only one in the afternoon as heretofore stated, at which no one was present save deponents and Mr. and Mrs. Bunch and the child, who entered the room as they were talking; and that there was no foundation whatever for the statements made by Bunch as to Randall's displaying money or saying he was looking to see if he had enough to pay a bill, or Twiggs' saying what was attributed to him. Randall further

swore that he was a poor man and had no roll of money in his pocket or elsewhere.

(7) Under the special facts of the case, the court should have required the witnesses to attend court in person, especially after the charge that defendant had kept them away had been made, and which it was not allowed to rebut.

(8) The court charged that if Mrs. Randall " did not ring the bell or cause any signal to be given to stop the car, and alighted from the car, as the company claim, while it was in motion, and she did not exercise ordinary care and caution, the company is not liable in damages, provided you believe the company was free from negligence." The error is in the proviso.

(9) The court charged, on the subject of damages, that "the law lays down a rule, and it is this: it says in cases of this kind the damages must be assessed according to the enlightened consciences of impartial jurors." Error, because inapplicable, there being no evidence of malice; because it does not call the attention of the jury to any act or neglect of Mrs. Randall to take proper care after the injury, the claim being for permanent injuries ; because, the plaintiffs not having introduced the mortuary tables or other evidence showing the permanency of the injury and the duration of life, and the judge himself stating that "you cannot by testimony prove the value of a pain or a bruise in dollars and cents," there was no direction as to how they were to be enlightened; and because it was calculated to mislead the jury into the belief that the whole case was thrown open to them, and that they had the right to fix the damages according to their enlightened consciences, without regard to the actual damages shown by the evidence.

(10) The court charged that "any pain and suffering or sorrow resulting from the miscarriage the law says

is an element of damages." Error, because pain and suffering are confounded with sorrow, and because sorrow for the loss of a child by miscarriage is not an element of damages.

(11) Defendant requested the court to charge thus: "A husband may recover for torts to his wife, under a declaration in which his wife joins him, but such recovery, if authorized under the law and evidence, is limited to the pain and suffering sustained. There can be no recovery for the loss of an unborn child." The court marked this as covered in the general charge, and refused to give it; but defendant insists that the charge covered only the last clause of it, and that the whole should have been given in the language requested.

(12) At the request of the defendant, the court charged thus: "A witness may be impeached by disproving the facts testified to by her, also by proof of contradictory statements previously made by her as to herself, revelant to her testimony and to the case; and an impeached witness is not to be believed, unless corroborated by other witnesses and circumstances in proof. If you find from the evidence that Mrs. Randall made statements in her testimony to the effect that she remained in bed and did not walk in the park or visit the Dressells on the evening of the alleged accident, and you believe that her statements have been disproved by the witnesses Dressell, McCall and McNally, then I charge you that Mrs. Randall is not to be believed unless you find she is sustained by other witnesses or corroborating circumstances in proof." But added this qualification, which was error: "This would be so provided you believe that the witnesses are entitled to belief and Mrs. Randall is not."

(13) The court refused to charge: "If you find from the evidence that Mrs. Randall testified she appointed a time for Dr. Ford to examine her and that

he did not do so, and that this statement of hers has been impeached and disproved by Dr. Ford, then I charge you that Mrs. Randall is not to be believed unless you find she is sustained by other witnesses and corroborating circumstances in the case." But first inserted the words, " and you believe Dr. Ford in preference to Mrs. Randall," just before the last clause, and then gave the whole in charge.

(14) The verdict was based upon prejudice and bias created by the statement of Judge Twiggs, that Randall had informed him that some one had in defendant's behalf tampered with his witnesses, and thereby kept Mrs. Bunch and Mrs. Rivers away from court; this statement being untrue, and Randall knowing it to be so when he informed Twiggs, as appears from the affidavits of J. M. and J. E. Bunch and Mosher, already set forth.

(15) Newly discovered evidence as contained in the affidavit of J. M. Bunch above set forth, touching Randall's displaying money, etc.

(16) Newly discovered evidence as found in the affidavits of Mrs. Bunch and Mrs. Rivers, above stated. With this ground appears the affidavit of defendant's counsel, as follows : The first time they heard the name of Mrs. Bunch as a witness for the plaintiff was on the morning of October 24, the second day of the trial, it then being given to the sheriff with the names of the other witnesses. It was not on the subpoena docket when defendant's counsel had the list of witnesses for both sides taken therefrom. The first they heard of Mrs. Bunch was when Mrs. Randall stated, as a witness, that Mrs. Bunch was with her on the night following her fall from the car, and could verify her statement as to her condition ; and this was the first time they knew that anybody but the Randall family had lived in the same house with them. On the next morning before court, they received from Mosher the

information as to the importance of Mrs. Bunch's testimony, and decided to immediately call the court's attention to this discovery and invoke its power to procure the testimony of the witness; but upon entering the court-room, the proceedings already related transpired. Had this testimony been known of before, steps would have been taken to procure it; but defendant's counsel had no knowledge or information of it.

(17-18) Verdict contrary to evidence.

(19) The verdict is excessive, particularly in that there was no evidence of miscarriage.

(20) The verdict was based upon prejudice and bias created in the minds of the jury by the statements of plaintiffs' counsel, as appears from the affidavit of one of the jurors. He swears that the impression made on his mind from what occurred was, that Mosher had used improper means to keep Mrs. Bunch away, and he was influenced in part by the impression against the defendant, and he believes that the same is true of the other jurors.

(21) Newly discovered evidence. Mrs. Randall stated in her testimony that "Dr. Doughty was the last physician I called in, and he prescribed for me. The last one I called before this occurred was Dr. Allen. As I stated, I had no use for one then, and only for the headache or neuralgia." Dr. Allen was seen for defendant, and agreed to attend court next morning without a subpoena. His affidavit shows that he was prevented from doing so by providential cause; that he never regarded himself as the family physician of plaintiffs; was called in 1883 to examine and prescribe for Mrs. Randall, and made a physical examination of her person; did not find her suffering from neuralgia, and did not then prescribe for that trouble; she was then in a bad state of health, and never since deponent had known her (for more than six years) had she been, in his opinion, of robust constitution or health.

The motion was overruled, and defendant excepted.

Frank H. Miller and J. S. & W. T. Davidson, for plaintiff in error.

Twiggs & Verdery, *contra.*

Simmons, Justice.

Randall and his wife sued the railroad company for damages sustained by reason of Mrs. Randall being thrown from a horse-car, and they recovered a verdict against the company. A motion for a new trial was made upon the several grounds set out therein, which will be found in the official report.

1. There was no error in excluding the affidavit made by Miss Klotz shortly after the alleged injury to Mrs. Randall. It was not attached to her depositions as a part of her answers thereto, and was offered as independent evidence, she having testified that the statements therein were true. If admissible at all, the affidavit should have been attached to her depositions and returned with them by the commissioner appointed to take them.

2. There was no error in excluding the testimony of the president of the company as to the degree of care exercised by the officers of the company prior to this accident in the selection of drivers. The question at issue was whether the driver was negligent upon that particular occasion.

3. Nor was there any error in excluding the testimony of a witness upon a former trial, as complained of in the third ground of the motion. The proof as to his death or inaccessibility was not sufficient.

4. There was no error in admitting in evidence on redirect examination of plaintiff the depositions of Annie L. Young, as complained of in the fourth ground of the motion, the objection thereto being that it was not in rebuttal. Whether in rebuttal or not, it was

within the discretion of the court to allow it, and we do not think that he abused his discretion.

5. The next ground complains that the court refused to compel two female witnesses to come into court and testify, or to continue the case in order that their interrogatories might be taken. Under the facts as stated in this ground of the motion, we do not think the court erred either in refusing to compel the two females to attend court, or in refusing to continue the case that their interrogatories might be taken. It was not shown to the court in a proper manner what the witnesses would testify, or the materiality of that testimony. This not being done, the court was right in refusing to compel the witnesses to attend, and in refusing to continue the case. We do not agree with the court, however, in the reason assigned by him for not compelling the attendance of the witnesses. We think every court, in the furtherance of justice, has a right to compel any witness within its jurisdiction to attend court and testify. In the case of female witnesses, we think that some good reason should be shown to the court why it is necessary for the females to attend in person, what they will testify, and the materiality of their testimony. If, upon this showing, the court is satisfied that it is necessary, in the furtherance of justice, for the female witnesses to attend court, he should issue an order requiring them to attend and testify in the case. The statute does not exempt females from attendance upon court; it simply permits their interrogatories to be taken. But while this is true, this provision of the statute should be followed unless it is shown to the court that it is necessary to have the personal attendance of the witnesses.

6. The sixth ground of the motion recites that in the argument before the jury, defendant's counsel stated that they had heard what had transpired in reference to

Mrs. Bunch's testimony; that he was unable to say what effect that testimony would have had, but desired to call the attention of the jury to the fact that defendant and its counsel had done everything in their power, as the jury saw, to have her brought into court, as they deemed it of great importance to have had her present. In conclusion, counsel for plaintiffs said to the jury that they also were anxious to have had Mrs. Bunch's testimony before them, she and Mrs. Rivers being the most important witnesses they had; that in his (counsel's) opinion, but for the unwarrantable interference on the part of Mosher (the defendant's superintendent) with the witness, Mrs. Bunch, he had no doubt she would have kept her promise and would have been in court promptly that morning; that the methods employed to keep the witnesses away were reprehensible in the extreme; that he exonerated his friend, the president of defendant, of any responsibility, but charged it on Mosher, the superintendent; and that but for this tampering with the witness, he believed that she would have been present.  Here defendant's counsel stated that there was no evidence to warrant the statement that Mosher had tampered with the absent witness; to which plaintiff's counsel replied that he did not claim that there was any such evidence, but simply drew an inference from what had transpired before the court and jury.  The court said he did not think counsel was authorized to make the statement without evidence; upon which plaintiff's counsel withdrew the statement, and continuing said to the jury:  "At all events, gentlemen, I believe before high heaven that if Mr. Mosher had not paid this visit to our witness this morning, she would have fulfilled her promise and would have come to court and testified in the case.  It would be improper for me to say what she would have testified to; but we deemed her testimony important, in fact our

most important witness, and were very anxious to have her present." We think the court erred in refusing to grant a new trial upon this ground. We think the remarks of counsel for the plaintiffs in his concluding speech to the jury were calculated to and doubtless did prejudice the minds of the jury against the defendant. The charge was positively and distinctly made that the superintendent of the defendant had tampered with the plaintiffs' witness and had prevailed upon her not to attend court and testify. Although, when corrected by the court, counsel withdrew the statement, he asserted afterwards that he " believed before high heaven" that if Mosher had not paid this visit to his witness, she would have fulfilled her promise and have come to court and testified in the case; that her testimony was most important, in fact she was the most important witness he had, and he was anxious to have had her appear. There was not a *scintilla* of testimony, so far as this record discloses, that Mosher had tampered with the witness. There was nothing to authorize such a statement save the charge made by counsel in the morning, not under oath, that Mosher had tampered with the witness, which was denied by defendant in like manner. The defendant also sought to introduce Mosher as a witness to testify under oath for the purpose of refuting the imputation cast upon him and his company. This was refused by the court. It is insisted, however, that defendant's counsel was also out of order in his remarks to the jury which are quoted above, and that therefore plaintiffs' counsel was entitled to reply. We think the remarks of defendant's counsel were improper, but do not think they justified plaintiffs' counsel in his remarks. If he had confined himself to a strict reply to the remarks of defendant's counsel, and insisted only that he too desired the presence of the witness, this would not have been sufficient to have authorized and

demanded a new trial in this case. But it will be seen that he went much further in his remarks than a simple reply to the remarks of defendant's counsel. He charged the defendant, through its superintendent, with tampering with the witness and preventing her attendance upon the court. This must have been very prejudicial to the defendant in the minds of the jury. Judge Thompson, in his most excellent work on "Trials" (vol. 1, §§963, 965), which is instructive to both bench and bar, lays down the following rule : "It is scarcely necessary to suggest that, in every judicial trial, a party must present his evidence either by the testimony of witnesses who are under oath, by the exhibition of documents which are competent under the rules of evidence, or by the exhibition of such material objects as are connected with the *res gestæ* and speak with reference to the issues on trial. He cannot be permitted to present his evidence in the form of the argument of his counsel to the jury, who is not sworn to speak the truth as a witness in the particular case. All courts, therefore, unite upon the conclusion that where counsel, in their argument to the jury, make statements of prejudicial matters which are not in evidence, it will afford ground for a new trial, unless the error is cured before the cause is finally submitted to the jury, in the manner stated in the preceding paragraphs. It is a necessary part of this rule that the matters thus improperly stated by counsel to the jury in argument should, in view of the issues on trial, the *status* of the parties, their attitude toward each other, and the like considerations, be, in their nature, of a tendency to *prejudice* the cause of the· opposing party in the minds of the jurors. Where such statements, though of matters not in evidence and hence improperly made, are *immaterial* or at least *not prejudicial*, they will afford no ground for a new trial. . . . On this subject it was said by

Fowler, J., in what has come to be regarded as a leading case: ' The counsel represents and is a substitute for his client; whatever, therefore, the client may do in the management of his cause may be done by his counsel. The largest and most liberal freedom of speech is allowed, and the law protects him in it. The right of discussing the merits of the cause, both as to law and the facts, is unabridged. The range of discussion is wide. He may be heard in argument upon every question of law. In his address to the jury it is his privilege to descant upon the facts proved or admitted in the pleadings; to arraign the conduct of the parties; to impugn, excuse, justify or condemn motives, so far as they are developed in evidence, assail the credibility of witnesses when it is impeached by direct evidence or by the inconsistency or incoherence of their testimony, their manner of testifying, their appearance upon the stand, or by circumstances. His illustrations may be as various as the resources of his genius; his argumentation as full and profound as learning can make it; and he may, if he will, give play to his wit, or wings to his imagination. To this freedom of speech, however, there are some limitations. His manner must be decorous. All courts have power to protect themselves from contempt, and indecency in words or sentences is contempt. This is a matter of course in the courts of civilized communities, but not of form merely. No court can command from an enlightened public that respect necessary to an even administration of the law without maintaining in its business proceedings that courtesy, dignity and purity which characterize the intercourse of gentlemen in private life. So, too, what a counsel does or says in the argument of a cause must be pertinent to the matter on trial before the jury, and he takes the hazard of its not being so. Now, statements of facts not proved and comments

thereon are outside of the cause. They stand legally irrelevant to the matter in question, and are therefore not pertinent. If not pertinent, they are not within the privilege of counsel.' (Tucker *v.* Henniker, 41 N. H. 317.) In 1878 this question came for the first time before the Supreme Court of Wisconsin, and it was said by Chief Justice Ryan, in delivering the opinion of the court, that it was to the honor of the bar that this was the case. The counsel who had transcended the bounds of professional propriety, by commenting upon a supposed state of facts not in evidence, was eminent at the bar and of high character; and the observations of the court, while not implying personal censure, give for this reason greater emphasis to the rule which it laid down. The following view was delivered from the bench, in respect of the limits of professional propriety in arguing facts to juries: 'The profession of law is instituted for the administration of justice. The duties of the bench and bar differ in kind, not in purpose. The duty of both alike is to establish the truth and to apply the law to it. It is essential to the proper administration of justice, frail and uncertain at best, that all that can be said for each party, in the determination of fact and law, should be heard. Forensic strife is but the method, and a mighty one, to ascertain the truth and the law governing the truth. It is the duty of counsel to make the most of the case which his client is able to give him; but counsel is out of his duty and the right, and outside of the principal object of his profession, when he travels out of his client's case and assumes to supply its deficiencies. Therefore it is that the nice sense of the profession regards with such distrust and aversion the testimony of a lawyer in favor of his client. It is the duty and right of counsel to indulge in all fair argument in favor of the right of his client; but he is outside of his duty

and his right when he appeals to prejudice irrelevant to the case. Properly, prejudice has no more sanction at the bar than on the bench. But an advocate may make himself the *alter ego* of his client, and indulge in prejudice in his favor. He may even share his client's prejudices against his adversary, as far as they rest on the facts in his case. But he has neither duty nor right to appeal to the prejudice, just or unjust, against his adversary, and *dehors* the very case he is to try. The very fullest freedom of speech, within the duty of his profession, should be accorded to counsel; but it is license, not freedom of speech, to travel out of the record, basing his argument on facts not appearing, and appealing to prejudices irrelevant to the case and outside of the proof. It may sometimes be a very difficult and delicate duty to confine counsel to a legitimate course of argument. But, like other difficult and delicate duties, it must be performed by those upon whom the law imposes it. It is the duty of the circuit courts, in jury trials, to interfere in all proper cases, of their own motion. This is due to truth and justice. And if counsel persevere in arguing upon pertinent facts not before the jury, or appealing to prejudices foreign to the case in evidence, exception may be taken by the other side, which may be good ground for a new trial, or for a reversal in this court.' " See also the remarks of LUMPKIN, J., in *Berry* v. *State*, 10 *Ga.* 511, 522; *Forsyth* v. *Cothran*, 61 *Ga.* 278. See also *Mitchum* v. *The State*, 11 *Ga.* 615, where this point is fully discussed by Judge NISBET.

7. The seventh ground of the motion has already been considered. Nor do we think there was any error in the eighth ground of the motion. The meaning of the charge complained of in this ground is, we think, that if the plaintiff, Mrs. Randall, did not exercise ordinary care and caution, she could not recover if the

v 85-21

company was free from negligence; but if she was negligent, and the company was also negligent, she might recover.

8. The ninth ground of the motion complains that the judge charged that in a case of this kind the damages must be assessed according to the enlightened consciences of impartial jurors. This charge is correct where the plaintiff seeks only to recover for injuries to the person and for pain and suffering. If the plaintiff seeks to recover special damages, such as expenses of nursing, physician's bill, medicine, etc., it is error to apply this rule to that character of damages. While the declaration in this case alleges special damages, it seems from the record that special damages were not insisted upon, but that the plaintiffs sought only to recover for injuries to the person and for pain and suffering. In this view of it, there was no error in giving the charge.

9. The tenth ground complains that the court charged that any pain and suffering or *sorrow* resulting from the miscarriage, the law says is an element of damage. We would suggest that the word "sorrow" be omitted from the charge of the court on the next trial. It is most too remote to be considered an element of damage, unless it is that sorrow which accompanies the actual injury and is suffered at the time of the miscarriage. The loss of a child by a miscarriage would affect women so differently that it would be hard for *men*, sitting as jurors, to estimate it as an element of damage; and we therefore think it would be better to omit, in the future, any instruction to the jury upon the question of sorrow as an element of damage. Pain and suffering give a wide latitude to juries, and there are very few complaints made of the smallness of the amounts found by juries upon these two elements of damage. Upon the question of sorrow being an

element of damage, see 5 A. & Eng. Eucl. of Law, 42 ; Bovee *v.* Danville, 53 Vt. 190.

10. We see no error as complained of in the other grounds of the motion not herein discussed.

*Judgment reversed.*